**EDGE, A PROFESSIONAL LAW CORPORATION**
Daniel A. Rozenblatt (SBN 336058)
daniel.rozenblatt@edge.law
Natasha Dandavati (SBN 285276)
natasha.dandavati@edge.law
981 Mission Street 20
San Francisco, CA 94103
Telephone: (415) 515-4809

**CAPSTONE LAW APC**
Cody R. Padgett (SBN 275553)
cody.padgett@capstonelawyers.com
Nathan N. Kiyam (SBN 317677)
nate.kiyam@capstonelawyers.com
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| RODNEY CARVALHO and MARK MAHER, individually and on behalf all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>HP, INC., a Delaware corporation,<br><br>　　　　　Defendant. | Case No. 5:21-cv-08015-PCP<br>*Assigned to the Hon. P. Casey Pitts*<br><br>**DECLARATION OF DANIEL A. ROZENBLATT IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND SETTLEMENT CLASS REPRESENTATIVES SERVICE AWARDS**<br><br>Date:　　August 21, 2025<br>Time:　　10:00 AM<br>Crtrm:　　8 |

I, Daniel A. Rozenblatt, declare as follows:

1. I am an attorney licensed to practice law in California and am admitted to practice before this Court. I am counsel to Plaintiffs Rodney Carvalho and Mark Maher ("Plaintiffs") in the above-captioned action. The following facts are within my personal knowledge, except as to those matters which are based on information and belief, and as to those matters, I believe them to be true to the best of my knowledge. If called as a witness herein, I can and will competently testify thereto.

2. I submit this declaration in support of Plaintiffs' Motion for Attorneys' Fees, Costs, and Settlement Class Representatives Service Awards.

3. I am the founder of EDGE, A Professional Law Corporation ("EDGE"), a law firm dedicated to representing consumers in complex litigation. I received my law degree from Duke University School of Law in 2020 and a B.A. in Economics from the University of California, Berkeley, in 2006. In addition to my work as an attorney, I have considerable experience in technology and quantitative analysis. After graduating from the University of California, I worked as an analyst for a real estate private equity firm and as an operations manager in aerospace manufacturing. Prior to matriculating at Duke University School of Law, I was involved in various web-based startups, wherein I developed close familiarity with internet technologies and software development.

4. As discussed in more detail below, EDGE has been significantly involved in all aspects of development and litigation of this case, including conceptualizing the legal theories, implementing and directing the pre-litigation investigation, quantitatively analyzing HP's pricing and discount practices as displayed on HP's website, and analyzing and developing the evidentiary and legal bases for Plaintiffs' classwide claims. EDGE was also significantly involved in conducting class outreach, drafting and preparing the complaint, drafting and responding to discovery, and in the law and motion practice that has arisen in this case. In furtherance of the preliminarily approved Settlement, EDGE was deeply immersed in the extensive settlement discussions with HP, in working with and assisting Plaintiffs' damages expert, and in selecting and coordinating with the settlement administrator.

5. In developing, initiating, litigating, and settling this action, I have brought to bear my

experience and knowledge in information technology and quantitative analysis. I began investigating HP's pricing practices on HP's website approximately six months before the filing of this action. As part of my investigation, I reviewed and analyzed the advertising on HP's website and gathered substantiation of potential false advertising claims relating to the reference prices and discounts displayed on HP's website. My work included analyzing in depth the structure of HP's website, including the manner in which prices and discounts were advertised on landing pages, on product category pages, on product detail pages, and throughout the checkout process. With the help of my assistants, I tracked the advertised prices and discounts by capturing daily screenshots of hundreds of products offered for sale on HP's website and inputting the data manually into an organized, tabular spreadsheet which provided the basis for our analysis of the factual and legal issues underlying Plaintiffs' claims of classwide liability.

**PLAINTIFFS' INVESTIGATION**

6. In May 2021, I helped design and develop proprietary evidence preservation software to acquire and store records of the prices and discounts displayed on HP's website. Developing this software required significant time and resources, including the use of cloud-based elastic computing platforms and custom relational database storage solutions. I was responsible for drafting the specifications of the software, including in developing the means and manner by which pricing data would be captured and exported for litigation purposes. I further assisted with the monitoring, debugging, and updating of the software, as necessary.

7. Using this proprietary software, EDGE was able to track the daily prices and discounts for hundreds of products on HP's website and to capture and collect hundreds of thousands of screenshots. The screenshots show the reference prices, sale prices, and discounts, as displayed to consumers shopping on HP's website, and provide evidence of the uniformity of the pricing representations that were made to the Settlement Class Members during the Settlement Class Period. Below is an example of one such screenshot captured and preserved by this software:



8. In addition, the software was used to dynamically collect and store the prices and discounts of hundreds of products offered on HP's website on a daily basis. The prices and discounts were input into a relational database from which the data could be queried and exported into spreadsheets. The spreadsheets were used to analyze the pricing data to better understand the factual and legal basis of Plaintiffs' claims and to demonstrate the pricing and discount histories for products sold on HP's website. This data analysis, which included the preparation of charts and graphics, would ultimately be used in the Complaint to substantiate Plaintiffs' allegations of classwide deceptive pricing practices.

9. Following the Court's Order on HP's Motion to Dismiss the First Amended Complaint ("FAC"), EDGE conducted further factual investigation in response to allegations that were raised in connection with the motion to dismiss—namely, that the products at issue were "non-exclusive" and sold at big box retailers like Best Buy and Staples. (*See* Order Granting in Part and

Denying in Part Motion to Dismiss, Dkt. No. 42, at 7 (finding that "[t]he computers and related peripherals that HP sells are sold both through HP's online website at HP.com and through traditional big box retailers, such as Best Buy and Staples").) To rebut this finding, my assistant and I conducted an investigation into 155 desktop computers and 121 laptop computers offered for sale on HP's website on or about June 29, 2022, and the availability of those computers at big box retailers such as Best Buy, Walmart, Office Depot, Staples, and Amazon. The results of this investigation laid the foundation for the allegations in Plaintiffs' Second Amended Complaint, which survived HP's subsequent motion to dismiss. (*See* Dkt. Nos. 43 ¶¶ 52–57, 43-1 and 43-2; *see also* Order Granting in Part and Denying in Part Motion to Dismiss Second Amended Complaint, Dkt. No. 57, at 8-10 (finding Plaintiffs' allegations regarding third-party retailers sufficient to meet the pleading standards of Rule 9(b)).)

10. The substantial evidence collected by EDGE as part of Plaintiffs' pre-suit and ongoing investigation laid the groundwork for the Settlement that was eventually reached between the Parties. The detailed pricing data was used to define the Settlement Class Period and Settlement Class Period and determine whether the Settlement Fund would provide sufficient relief to the Settlement Class Members. Moreover, the detailed pricing data gave counsel a clearer view of the strengths and weaknesses of Plaintiffs' claims, and the challenges they would face in attempting to certify a damages class pursuant to Federal Rule of Civil Procedure 23(b)(3).

**SETTLEMENT BENEFITS TO THE CLASS**

11. The preliminarily approved Settlement was the product of hard-fought, arms-length negotiations between Plaintiffs, HP, and their respective counsel. On June 12, 2024, together with my associate Natasha Dandavati and our co-counsel at Capstone Law APC, I personally engaged in a full day videoconference mediation with the Honorable Irma E. Gonzalez of JAMS. In advance of the mediation, Plaintiffs produced over 500,000 screenshot captures of HP's website and an analysis of the pricing data collected as part of their investigation. Plaintiffs also prepared a detailed mediation brief with hundreds of pages of exhibits to apprise Judge Gonzalez of the complex factual and legal issues presented in this case. During the mediation itself, progress toward resolution was made incrementally, as both sides zealously advocated in support of their respective positions. Judge

Gonzalez, however, was able to provide a useful, neutral analysis of the issues and risks to both sides, and with her assistance, the Parties were able to reach an agreement in principle on the key terms during the mediation.

12. In the months that followed, the Parties continued to negotiate and finalize the Settlement. These negotiations included identifying and agreeing on the specific products and sales which now define the preliminarily approved Settlement Class, and negotiating the scope of the release. The Parties exchanged numerous drafts of the Settlement Agreement as well as the exhibits attached thereto, such as the notice forms, claim form, and a proposed preliminary approval order. In addition, HP produced sales data for 287,784 unique orders placed during the Class Period that contain Class Products.[1] At all times before, during, and after the mediation, the Parties' negotiations were adversarial and non-collusive.

13. The preliminarily approved Settlement is based on an analysis of the information and evidence produced by HP, the pricing data collected as part of EDGE's investigation, and the analysis of Plaintiffs' damages expert, Christian Tregillis. Mr. Tregillis analyzed HP's sales data to estimate the Settlement Class Members' damages and assess the relief provided to the Class as part of the Settlement. In addition, throughout the negotiations which culminated in the preliminarily approved Settlement, we evaluated the strengths and weaknesses of Plaintiffs' claims, objectively assessed the risks of continued litigation, and analyzed in detail prior deceptive pricing class action settlements to determine a reasonable range of relief for the Settlement Class. Based on the foregoing, I feel confident that, together with our co-counsel, we were able to realistically assess the value of Plaintiffs' and the Settlement Class Members' claims, and intelligently engage defense counsel in settlement discussions that culminated in the preliminarily approved settlement.

14. As detailed in Mr. Tregillis's declaration in support of Plaintiffs' Motion for Preliminary Approval (dkt. 85-3, hereinafter "Tregillis Decl."), for each of the Settlement Class Products, Mr. Tregillis estimated damages owed to the average Settlement Class Member who

---

[1] Plaintiffs relied on this figure as indicating there will be approximately 287,784 Settlement Class Members. That number may be less, however, if more than one Settlement Class Member placed more than one order. (*See* Declaration of Christian Tregillis ("Tregillis Decl.") ¶ 24, filed concurrently herewith.)

1 purchased the product based on the average reference price and sale price for the product during the
2 Class Period. (Tregillis Decl. ¶¶ 25-26.) Using this data and information provided by HP, Mr.
3 Tregillis then estimated the average price consumers would have been willing to pay had HP
4 advertised the actual regular price of the Class Products during the Class Period, and calculated the
5 average overpayment based on this price. (*Id.* ¶¶ 27-30.) This measurement of damages—the
6 difference between the price the consumer paid and the price a consumer would have been willing to
7 pay for the product had it been labeled accurately—is a commonly accepted measurement of
8 damages in false advertising cases brought under California's consumer protection statutes. *See,*
9 *e.g.*, *Moore v. GlaxoSmithKline*, 713 F. Supp. 3d 660, 678 (N.D. Cal. 2024) (citing *Pulaski &*
10 *Middleman v. Google*, 802 F.3d 979, 988-89 (9th Cir. 2015)).

11       15.      Based on Tregillis's analysis, Settlement Class Members, on average, overpaid for
12 the Class Products between $0 and $91. (Tregillis Decl. ¶ 31.) Based on our discussions with Kroll,
13 the preliminarily approved Settlement Class Administrator, to ensure that distribution of the Cash
14 Benefits would be administratively feasible, we suggested using five tranches based on product type
15 and per-unit estimated damages in the following ranges: (1) $0.00 - $10.00 (for mice and
16 keyboards); (2) $0.00 - $25.00 (Computers); (3) $25.01 - $50.00 (Computers); (4) $50.01 - $75.00
17 (Computers); and (5) $75.01 - $100.00 (Computers). Based on the amount of the Settlement Fund
18 and the expected claims rate, we suggested that each Settlement Class Member receive the upper
19 end of the per-unit estimated damages tranche. Although we do not yet know what the claims rate
20 will be, I understand that typical claims rates in similar cases range from 3% to 15%. (Declaration of
21 Patrick M. Passarella, filed in connection with Plaintiffs' Motion for Preliminary Approval, dkt. 85-
22 4, ¶ 5; *see also* Tregillis Decl. ¶¶ 33-36.)

23       16.      Under the Settlement Agreement, HP has agreed to pay $4 million into a *non-*
24 *reversionary common fund* ("Settlement Fund") that will be used to pay Cash Benefits to Settlement
25 Class Members, settlement administration costs, and service and fee awards to the class
26 representatives and class counsel, as approved by the Court. Assuming settlement administration
27 costs of $250,000 and an award to Class Counsel of $1 million, the Settlement will provide
28 approximately $2.75 million to be paid directly to Settlement Class Members who submit valid

claims. Based on these figures, I understand that, assuming a conservative 15% claims rate, Settlement Class Members will receive at a minimum, the estimated per-unit damages for the Class Product they purchased. (Tregillis Decl. ¶ 36.) I further understand that based on the estimated 287,784 Settlement Class Members (*see supra* n.1), an expected claims rate of 15% would result in 43,168 claims and an average Cash Benefit of $63.70 ($2,750,000 ÷ 43,168).[2]

**HOURS EXPENDED AND WORK UNDERTAKEN**

17. Our team has dedicated substantial time to this case since its inception. Natasha Dandavati and I have diligently recorded the hours we spent working on this matter, and I have reviewed our billing records for accuracy. To date, we have collectively expended 841.5 hours prosecuting this action. This figure does not include the additional hours that will be required to continue supervising settlement administration, preparing the motion for final approval, and appearing at the final approval hearing, among other post-settlement responsibilities. The following chart identifies the hours that Ms. Dandavati and I have contributed to this matter, along with our respective billing rates, the total requested fees, and our resulting blended hourly rate:

| Lawyer | Law School | Grad. Year | Rate | Hours | Fees |
|---|---|---|---|---|---|
| Daniel Rozenblatt (Pt.) | Duke U. | 2020[3] | $545 | 633.9 | $345,475.50 |
| Natasha Dandavati (Assoc.) | U. Penn. | 2012 | $525 | 207.6 | $108,990.00 |
| | | **Total** | **$540** | **841.5** | **$454,465.50** |

18. Below is a breakdown of our hours expended, broken down by activity:

| Activity | D.R. Hours | N.D. Hours | Total Hours | Total Fees |
|---|---|---|---|---|
| Fact investigation | 71.5 | - | 71.5 | $ 38,967.50 |
| Class outreach/intake | 15.8 | - | 15.8 | $ 8,611.00 |

---

[2] As of the date of this declaration, the claims rate is 7.22%. While we expect the claims rate to continue increasing as the June 9, 2025, submission deadline approaches, based on the current claims rate, each Settlement Class Member would be estimated to receive, on average, approximately $132.35.

[3] Provisionally licensed in 2020 under Rule 9.49, which was adopted in response to the COVID-19 pandemic to authorize temporary licensure of 2020 law school graduates.

| | | | | |
|---|---|---|---|---|
| Client meetings/communications | 14.9 | 2.1 | 17.0 | $ 9,223.00 |
| Pleadings and related matters | 86.0 | - | 86.0 | $ 46,870.00 |
| Discovery | 41.8 | 52.5 | 94.3 | $ 50,343.50 |
| Legal research/analysis/strategy | 48.7 | 9.1 | 57.8 | $ 31,319.00 |
| Oppositions to motions to dismiss | 70.1 | - | 70.1 | $ 38,204.50 |
| Hearings (preparation and attendance) | 40.5 | 0.4 | 40.9 | $ 22,282.50 |
| Non-motion filings/administrative matters | 17.8 | 3.3 | 21.1 | $ 11,433.50 |
| Meetings/correspondence with co-counsel and opposing counsel | 61.4 | 59.4 | 120.8 | $ 64,648.00 |
| Settlement negotiations/mediation | 67.3 | 18.6 | 85.9 | $ 46,443.50 |
| Meetings/correspondence with experts | 7.6 | 1.6 | 9.2 | $ 4,982.00 |
| Settlement approval motions/documents | 89.3 | 32.4 | 121.7 | $ 65,678.50 |
| Meetings/correspondence with class administrator | 1.2 | 28.2 | 29.4 | $ 15,459.00 |
| **Total** | 633.9 | 207.6 | 841.5 | $ 454,465.50 |

19. The requested rates reflect reasonable rates approved by courts in this district in consumer class actions. *See In re MacBook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2023 WL 3688452, at *15 (N.D. Cal. May 25, 2023) (approving rates in a consumer class action of $875–$1,195 per hour for partners; $385–$850 per hour for associates); *Smith v. Keurig Green Mountain, Inc.*, No. 18-CV-06690-HSG, 2023 WL 2250264, at *10 (N.D. Cal. Feb. 27, 2023) (finding rates requested are between $300 to $575 for associates and $720 to $925 for partners); *Hashemi v. Bosley, Inc.*, No. CV 21-946 PSG (RAOX), 2022 WL 18278431, at *10 (C.D. Cal. Nov. 21, 2022) (finding that, in Los Angeles, partners litigating consumer-related matters . . . have hourly rates ranging from $304 to $965, and associates have hourly rates ranging from $287 to $719); *Alvarez v. Sirius XM Radio Inc.*, No. CV 18-8605 JVS(SSX), 2021 WL 1234878, at *11 (C.D. Cal. Feb. 8, 2021) (finding hourly rates ranging from $450 for an associate to $950 for a partner "are reasonable given prevailing rates in the Los Angeles region"); *Marshall v. Northrup Grumman Corp.*, No. 16-cv-06794, 2020 WL 5668935, at *7 (C.D. Cal. Sept. 18, 2020) (approving attorney rates between $490 and $1,060 per hour); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 15-cv-01614, 2018 WL 8334858, at *6 (C.D. Cal. July 30, 2018) (approving billing rates between $600 and $825 per hour for attorneys with more than ten years of experience, $325 to $575 per hour for attorneys with ten or fewer years of experience, and $250

per hour for paralegals and clerks); *Gutierrez v. Wells Fargo Bank, N.A.*, No. 07-cv-05923, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (approving rates ranging $475–$975 for partners, $300–$490 for associates).

20. Finally, EDGE's rates are in line with the adjusted Laffey Matrix and the Fitzpatrick Matrix, two fee scales that courts often consult in determining the reasonableness of hourly rates for complex litigation. *See* **Exhibits 1** and **2** attached hereto.

21. EDGE prosecuted this case on a purely contingent basis, agreeing to advance all necessary expenses and to only receive a fee if the case provided a benefit to Plaintiffs and the class. EDGE's outlay of costs and expenses has been considerable, particularly in light of the significant factual investigation necessary to prosecute this action. The work performed in this case was reasonable and necessary to the prosecution and settlement of this case. As a result of EDGE's comprehensive legal and factual investigation, Plaintiffs were able to achieve a substantial settlement relatively quickly, despite the complexities inherent in prosecuting false discount claims on a class-wide basis.

22. To date, EDGE has advanced $38,209.24 in necessary litigation expenses. Below is a summary breakdown of these expenses:

| Cost Category | Amount |
|---|---:|
| Advertising/class outreach | $ 6,775.12 |
| Cloud computing services | $ 3,860.12 |
| Experts/consultants | $ 9,382.50 |
| Filing fees, service of process | $ 402.00 |
| Postage | $ 26.36 |
| Research Services (PACER, Westlaw, Lexis) | $ 1,720.31 |
| Software development & maintenance | $ 15,974.24 |
| Travel-related costs & expenses | $ 68.59 |
| **Total** | **$ 38,209.24** |

## PLAINTIFFS' SERVICE AWARDS

23. Plaintiffs seek service awards in recognition of the time and effort they devoted to this case. Their declarations (filed concurrently herewith) describe the meaningful contributions they made throughout the litigation and in reaching the proposed settlement. Throughout the litigation, I

have been in continual contact with both Mr. Carvalho and Mr. Maher regarding the developments in the litigation, the progress of settlement discussions, and the class settlement agreement and administration. Plaintiffs consulted with me before filing suit; reviewed and approved important filings; searched for and produced documents as necessary; reviewed and verified written discovery responses; opined on the proposed Class Settlement; and reviewed and approved of the Class Settlement Agreement on behalf of the proposed Settlement Class. Plaintiffs undertook the commitment to serve as class representatives, to fairly and adequately represent the interests of the class, and not put their own interests ahead of the class, and they did so without any guarantee of recompense. Plaintiffs remained engaged with me throughout the case and were undoubtedly of service to the Settlement Class.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: May 5, 2025

Daniel A. Rozenblatt

**EXHIBIT 1**

# LAFFEY MATRIX

History

Case Law

See the Matrix

Contact us

Home

|  |  |  | Years Out of Law School * | | | | |
|---|---|---|---|---|---|---|---|
| Year | Adjustmt Factor** | Paralegal/ Law Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/24- 5/31/25 | 1.080182 | $258 | $473 | $581 | $839 | $948 | $1141 |
| 6/01/23- 5/31/24 | 1.059295 | $239 | $437 | $538 | $777 | $878 | $1057 |
| 6/01/22- 5/31/23 | 1.085091 | $225 | $413 | $508 | $733 | $829 | $997 |
| 6/01/21- 5/31/22 | 1.006053 | $208 | $381 | $468 | $676 | $764 | $919 |
| 6/01/20- 5/31/21 | 1.015894 | $206 | $378 | $465 | $672 | $759 | $914 |
| 6/01/19- 5/31/20 | 1.0049 | $203 | $372 | $458 | $661 | $747 | $899 |
| 6/01/18- 5/31/19 | 1.0350 | $202 | $371 | $455 | $658 | $742 | $894 |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g.,DL v. District of Columbia, 267 F.Supp.3d 55, 69 (D.D.C. 2017)

* ï¿½Years Out of Law Schoolï¿½ is calculated from June 1 of each year, when most law students graduate. ï¿½1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). ï¿½4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier ï¿½1-3" from June 1, 1996 until May 31, 1999, would move into tier ï¿½4-7" on June 1, 1999, and tier ï¿½8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

**EXHIBIT 2**

# THE FITZPATRICK MATRIX

Hourly Rates ($) for Legal Fees for Complex Federal Litigation in the District of Columbia

| Years Exp. / Billing Yr. | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35+ | 535 | 563 | 591 | 619 | 647 | 675 | 703 | 731 | 736 | 760 | 807 | 864 | 933 |
| 34 | 534 | 562 | 590 | 618 | 646 | 674 | 702 | 729 | 734 | 758 | 805 | 862 | 931 |
| 33 | 532 | 560 | 588 | 616 | 644 | 672 | 700 | 728 | 733 | 757 | 804 | 861 | 930 |
| 32 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 726 | 730 | 754 | 801 | 858 | 927 |
| 31 | 527 | 555 | 583 | 611 | 639 | 667 | 695 | 723 | 728 | 752 | 799 | 856 | 924 |
| 30 | 524 | 552 | 580 | 608 | 636 | 664 | 692 | 720 | 725 | 749 | 795 | 851 | 919 |
| 29 | 521 | 549 | 577 | 605 | 633 | 661 | 689 | 717 | 721 | 745 | 791 | 847 | 915 |
| 28 | 517 | 545 | 573 | 601 | 629 | 657 | 685 | 713 | 717 | 741 | 787 | 843 | 910 |
| 27 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 708 | 713 | 736 | 782 | 838 | 905 |
| 26 | 508 | 536 | 564 | 592 | 620 | 648 | 676 | 704 | 708 | 731 | 776 | 831 | 897 |
| 25 | 502 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 703 | 726 | 771 | 826 | 892 |
| 24 | 497 | 525 | 553 | 581 | 609 | 637 | 665 | 693 | 697 | 720 | 765 | 819 | 885 |
| 23 | 491 | 519 | 547 | 575 | 603 | 630 | 658 | 686 | 691 | 714 | 758 | 812 | 877 |
| 22 | 484 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 684 | 707 | 751 | 804 | 868 |
| 21 | 477 | 505 | 533 | 561 | 589 | 617 | 645 | 673 | 677 | 699 | 742 | 795 | 859 |
| 20 | 470 | 498 | 526 | 553 | 581 | 609 | 637 | 665 | 670 | 692 | 735 | 787 | 850 |
| 19 | 462 | 490 | 518 | 546 | 574 | 602 | 630 | 658 | 662 | 684 | 726 | 778 | 840 |
| 18 | 453 | 481 | 509 | 537 | 565 | 593 | 621 | 649 | 653 | 675 | 717 | 768 | 829 |
| 17 | 445 | 473 | 500 | 528 | 556 | 584 | 612 | 640 | 645 | 666 | 707 | 757 | 818 |
| 16 | 435 | 463 | 491 | 519 | 547 | 575 | 603 | 631 | 635 | 656 | 697 | 746 | 806 |
| 15 | 426 | 454 | 482 | 510 | 538 | 566 | 593 | 621 | 626 | 647 | 687 | 736 | 795 |
| 14 | 416 | 443 | 471 | 499 | 527 | 555 | 583 | 611 | 615 | 635 | 674 | 722 | 780 |
| 13 | 405 | 433 | 461 | 489 | 517 | 545 | 573 | 601 | 605 | 625 | 664 | 711 | 768 |
| 12 | 394 | 422 | 450 | 478 | 506 | 534 | 562 | 590 | 594 | 614 | 652 | 698 | 754 |
| 11 | 382 | 410 | 438 | 466 | 494 | 522 | 550 | 578 | 582 | 601 | 638 | 683 | 738 |
| 10 | 371 | 399 | 427 | 455 | 483 | 510 | 538 | 566 | 570 | 589 | 625 | 669 | 723 |
| 9 | 358 | 386 | 414 | 442 | 470 | 498 | 526 | 554 | 558 | 576 | 612 | 655 | 707 |
| 8 | 345 | 373 | 401 | 429 | 457 | 485 | 513 | 541 | 545 | 563 | 598 | 640 | 691 |
| 7 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 528 | 532 | 550 | 584 | 625 | 675 |
| 6 | 319 | 347 | 375 | 403 | 431 | 458 | 486 | 514 | 518 | 535 | 568 | 608 | 657 |
| 5 | 305 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 504 | 521 | 553 | 592 | 639 |
| 4 | 290 | 318 | 346 | 374 | 402 | 430 | 458 | 486 | 489 | 505 | 536 | 574 | 620 |
| 3 | 275 | 303 | 331 | 359 | 387 | 415 | 443 | 471 | 474 | 490 | 520 | 557 | 602 |
| 2 | 260 | 287 | 315 | 343 | 371 | 399 | 427 | 455 | 458 | 473 | 502 | 538 | 581 |
| 1 | 244 | 272 | 300 | 328 | 356 | 384 | 412 | 439 | 442 | 457 | 485 | 519 | 561 |
| 0 | 227 | 255 | 283 | 311 | 339 | 367 | 395 | 423 | 426 | 440 | 467 | 500 | 540 |
| P* | 130 | 140 | 150 | 160 | 169 | 179 | 189 | 199 | 200 | 207 | 220 | 236 | 255 |

\* = Paralegals/Law Clerks

*Published by the U.S. Attorney's Office for the District of Columbia, Civil Division*

Explanatory Notes

1. This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared to assist with resolving requests for attorney's fees in complex civil cases in District of Columbia federal courts handled by the Civil Division of the United States Attorney's Office for the District of Columbia. It has been developed to provide "a reliable assessment of fees charged for complex federal litigation in the District [of Columbia]," as the United States Court of Appeals for the District of Columbia Circuit urged. *DL v. District of Columbia*, 924 F.3d 585, 595 (D.C. Cir. 2019). The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, nor has it been adopted by other Department of Justice components.

2. The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees. *E.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b). A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). The matrix is not intended for use in cases in which the hourly rate is limited by statute. *E.g.*, 28 U.S.C. § 2412(d).

3. For matters in which a prevailing party agrees to payment pursuant to this fee matrix, the United States Attorney's Office will not request that a prevailing party offer the additional evidence that the law otherwise requires. *See, e.g., Eley v. District of Columbia*, 793 F.3d 97, 104 (D.C. Cir. 2015) (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (requiring "evidence that [the] 'requested rates are in line with those prevailing in the community for similar services'")).

4. The years in the column on the left refer to an attorney's years of experience practicing law. Normally, an attorney's experience will be calculated based on the number of years since an attorney graduated from law school. If the year of law school graduation is unavailable, the year of bar passage should be used instead. Thus, an attorney who graduated from law school in the same year as the work for which compensation is sought has 0 years of experience. For all work beginning on January 1 of the calendar year following graduation (or bar admission), the attorney will have 1 year of experience. (For example, an attorney who graduated from law school on May 30 will have 0 years of experience until December 31 of that same calendar year. As of January 1, all work charged will be computed as performed by an attorney with 1 year of experience.) Adjustments may be necessary if an attorney did not follow a typical career progression or was effectively performing law clerk work. *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate).

5. The data for this matrix was gathered from the dockets of cases litigated in the U.S. District Court for the District of Columbia using the following search in July 2020 in Bloomberg Law: keywords ("motion n/5 fees AND attorney!") + filing type ("brief," "motion," or "order") + date ("May 31, 2013 – May 31, 2020" under "Entries (Docket and Documents)"). This returned a list of 781 cases. Of those, cases were excluded if there was no motion for fees filed, the motions for fees lacked necessary information, or the motions involved fees not based on hourly rates, involved rates explicitly or implicitly based on an existing fee matrix, involved rates explicitly or implicitly subject to statutory fee caps (e.g., cases subject to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)), or used lower rates prescribed by case law (*e.g.*, *Eley*, 793 F.3d at 105 (Individuals with Disabilities in Education Act cases)). After these excisions, 86 cases, many of which included data for multiple billers (and 2 of which only provided hourly rate data for paralegals), remained.

6. The cases used to generate this matrix constitute complex federal litigation—which caselaw establishes as encompassing a broad range of matters tried in federal court. *E.g.*, *Reed v. District of Columbia*, 843 F.3d 517, 527-29 (D.C. Cir. 2016) (Tatel, J., concurring) (noting that cases arising under the Freedom of Information Act, Title VII, the Americans with Disabilities Act, Constitutional Amendments, antitrust statutes, and others have been deemed complex, and even "relatively small" cases can constitute complex federal litigation, as they too require "specialized legal skills" and can involve "complex organizations," such as "large companies"); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 14-16, 17 (D.D.C. 2008) (prevailing market rates for complex federal litigation should be determined by looking to "a diverse range of cases"). That the attorneys handling these cases asked the court to award the specified rates itself demonstrates that the rates were "'adequate to attract competent counsel, [while] not produc[ing] windfalls to attorneys.'" *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). As a consequence, the resulting analysis yields the "prevailing market rate[] in the relevant community" for complex litigation undertaken in federal courts in the District of Columbia. *See Blum*, 465 U.S. at 895.

7. From these 86 complex federal cases, the following information was recorded for 2013 and beyond: hourly rate, the calendar year the rate was charged, and the number of years the lawyer was out of law school when the rate was charged (or, if law school graduation year was unavailable, years since bar passage), as defined above. If the graduation or bar passage year was not stated in a motion or its exhibits, then the lawyer's biography was researched on the internet. Although preexisting fee matrices for the District of Columbia provide for mid-year rate changes, very few lawyers in the data submitted rates that changed within a calendar year. For this reason, the matrix was modeled using one rate for each calendar year. On the occasions when a lawyer expressed an hourly rate as a range or indicated the rate had increased during the year, the midpoint of the two rates was recorded for that lawyer-year.

8. The matrix of attorney rates is based on 675 lawyer-year data points (one data point for each year in which a lawyer charged an hourly rate) from 419 unique lawyers from 84 unique cases. The lawyer-year data points spanned from years 2013 to 2020, from $100 to $1250, and from less than one year of experience to 58 years.

9. Paralegal/law clerk rates were also recorded. The following titles in the fee motions were included in the paralegal/law clerk data: law clerk, legal assistant, paralegal, senior legal assistant, senior paralegal, and student clerk. The paralegal/law clerk row is based on 108 paralegal-year data points from 42 unique cases. They spanned from 2013 to 2019 and from $60 to $290. (It is unclear how many unique persons are in the 108 data points because paralegals were not always identified by name.)

10. The matrix was created with separate regressions for the lawyer data and the paralegal data. For the paralegal data, simple linear least-squares regression was used with the dependent variable hourly rate and the independent variable the year the rate was charged subtracted from 2013; years were combined into one variable and subtracted from 2013 rather than modeled as separate indicator variables to constrain annual inflation to a constant, positive number. The resulting regression formula was rate = 129.8789 + 9.902107 * (year-2013). For the lawyer data, least-squares regression was used with the dependent variable hourly rate and independent variables the year the rate was charged and the number of years of experience of the lawyer when the rate was charged. The year the rate was charged was subtracted from 2013 and modeled linearly as with the paralegal data. The number of years out of law school (or since year of bar passage) was modeled with both linear and squared terms, as is common in labor economics to account for non-linear wage growth (e.g., faster growth earlier in one's career than at the end of one's career). *See, e.g.*, Jacob Mincer, *Schooling, Experience, and Earnings* (1974). The resulting regression formula was

rate = 227.319 + 16.54492 * experience - 0.2216217 * experience ^ 2 + 27.97634 * (year-2013).  Regressions were also run with log transformed rates and with a random-effect model (to account for several lawyers appearing more than once in the data), but both alternatives resulted in mostly lower rates than those reflected here; in order to minimize fee disputes, these models were therefore rejected in favor of the more generous untransformed, fixed-effect model.  Rates from one case comprised 20% of the data; the regression was also run without that case, but the resulting rates were mostly lower and therefore rejected, again to minimize fee disputes.

11. The data collected for this matrix runs through 2020.  To generate rates after 2020, an inflation adjustment (rounded to the nearest whole dollar) has been added.  The United States Attorney's Office determined that, because courts and many parties have employed the legal services index of the Consumer Price Index to adjust attorney hourly rates for inflation, this matrix would do likewise.  *E.g.*, *Salazar v. District of Columbia*, 809 F.3d 58, 64-65 (D.C. Cir. 2015); *Eley*, 793 F.3d at 101-02; *DL*, 924 F.3d at 589-90.  That was the approach followed for the years 2021 through and including 2023.  However, the Bureau of Labor Statistics has now ceased consistently publishing monthly data for the legal services index of the Consumer Price Index.  As an alternative, the legal services index of the Producer Price Index, which continues regularly to provide updated data, has been used to generate the rates for 2024 and thereafter.

12. This matrix was researched and prepared by Brian Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt Law School, with the help of his students.

13. This matrix and an alternative, preexisting matrix were extensively examined, and, based on that analysis, this matrix was the one selected for computation of the hourly rates for the attorneys' fees awarded in *J.T. v. District of Columbia*, 652 F. Supp. 3d 11 (D.D.C. 2023) (Howell, C.J.), and in *Brackett v. Mayorkas*, Civ. A. No. 17-0988, 2023 WL 5094872 (D.D.C. Aug. 9, 2023) (Boasberg, C.J.).